UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
MARIANNA PRZHEBELSKAYA,
VLADIMIR PRZHEBELSKAYA, and
YEVGENIA PRZHEBELSKAYA,

                  03 CV 3303 (NG)

           Plaintiffs,

- against -

                  **OPINION AND ORDER**

UNITED STATES BUREAU OF
CITIZENSHIP AND IMMIGRATION
SERVICES, JOHN ASHCROFT, Attorney
General of the United States, EDUARDO
AGGUAIRE, JR., Commissioner of the
Bureau of Citizenship and Immigration Services,
and EDWARD MCELROY, District Director
of the Bureau of Citizenship and Immigration
Services,

           Defendants.
------------------------------------------------------------------x

GERSHON, United States District Judge:

      Plaintiffs applied to become lawful permanent residents of the United States after Marianna Przhebelskaya won the diversity visa lottery in 2003. Plaintiffs brought this action for mandamus relief when their applications for adjustment of status were denied. Defendants voluntarily reopened plaintiffs' cases, but took no action on them for months. As the statutory deadline approached, this court ordered defendants to complete adjudication of plaintiffs' applications. Defendants failed to do so before the limited number of visas allocated for use in 2003 were distributed. Ultimately, they did issue a visa to Marianna, but, as a result of the delay, Vladimyr and Yevgenia Przhebelskaya were unable to attain lawful permanent resident status. Plaintiffs now ask the court to hold defendants in contempt, and for an order compelling defendants to adjust the status of Vladimyr and Yevgenia to that of lawful permanent residents. For the reasons set forth below, the plaintiffs'

1

motion to compel is granted.

## BACKGROUND

*The DV Lottery*

An alien living in the United States may become a lawful permanent resident by applying for an adjustment of status. 8 U.S.C. § 1255(a). To obtain such an adjustment, the applicant must be eligible to receive an immediately available immigration visa. *Id.*[1] Eligibility for a "diversity visa" is one basis on which an application for adjustment of status may be granted. The diversity visa program was created by Congress in 1990 to facilitate immigration from countries with historically low rates of immigration to the United States. *See* Immigration Act of 1990 § 131, Pub. L. 101-649, 104 Stat. 4978. Through its operation, each year, the Department of State randomly selects approximately 100,000 individuals, from a pre-qualified group of millions, to be eligible to apply for diversity visas.[2] The selection process, authorized by Section 203(c) of the Immigration and Naturalization Act ("INA"), is commonly known as the diversity visa lottery ("DV Lottery"). 8 U.S.C. § 1153(c). Spouses and minor children of lottery winners are entitled to submit derivative applications for diversity visas. 8 U.S.C. § 1153(d). A derivative application will not be granted unless the primary application is granted. *See* Decl. of John Isoldi, Temporary Supervisory District

---

[1] Section 245(a) of the Immigration and Naturalization Act ("INA") provides that the status of an alien "may be adjusted by the Attorney General, in his discretion and under such regulations as he may prescribe, to that of an alien lawfully admitted for permanent residence if (1) the alien makes an application for such adjustment, (2) the alien is eligible to receive an immigrant visa and is admissible to the United States for permanent residence, and (3) an immigrant visa is immediately available to him at the time his application is filed." 8 U.S.C. § 1255(a).

[2] Diversity visas are allocated among six geographic regions, according to a sliding scale. A greater number of visas go to regions with lower rates of immigration during the preceding five year period. No visas go to countries that have sent more than 50,000 immigrants to the United States during the preceding five year period. Within each region, no one country may receive more than seven percent of the diversity visas available in any one fiscal year. 8 U.S.C. § 1153(c)(1).

2


Adjudications Officer, United States Customs and Immigration Services ("Isoldi Decl.") ¶ 6.

Winning the lottery, however, does not guarantee the issuance of a visa and corresponding adjustment of status, even if the applicant is fully qualified and completes all application requirements. A maximum of 55,000 diversity visas are issued annually, 5,000 of which are reserved for use pursuant to the Nicaraguan and Central American Relief Act, Pub. L. No. 105-100, 111 Stat. 2193 (1997), leaving 50,000 diversity visas available to the general applicant pool. *See* 8 U.S.C. §§ 1151(a)(3), 1151(e), 1153(c)(1). Thus, there are typically twice as many lottery winners as there are diversity visas available in a given year. For this reason, one court has likened the DV Lottery to the Publishers Clearinghouse Sweepstakes, in that participants receive large envelopes "announcing in huge letters that the person is ALREADY A WINNER, but containing a disclaimer buried in the middle of the packet that explains that the only thing that has been won is a chance at the big prize." *Ahmed v. Dept. of Homeland Security*, 328 F.3d 383, 384 (7th Cir. 2003) (emphasis in original).

Although the Department of State administers the DV Lottery generally, the United States Citizenship and Immigration Services (the "Agency"), successor to the Immigration and Naturalization Service ("INS"),[3] is responsible for adjudicating the diversity visa applications of applicants who reside in the United States at the time of their selection. To obtain a diversity visa, a lottery winner residing in the United States must complete a rigorous application process and receive approval from the Agency by the end of the fiscal year in which the lottery is held. The application process requires the completion of numerous forms, the submission of fingerprints, an

---

[3] On March 1, 2003, the INS was abolished and its functions were transferred to the Department of Homeland Security. *See* Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135. The Bureau of Citizenship and Immigration Services ("BCIS") took over the service and benefit functions of the INS. This agency was later renamed the United States Citizenship and Immigration Services ("USCIS"). All three of these entities will be referred to, interchangeably, as the "Agency" throughout this opinion.

interview, and background checks by both the Federal Bureau of Investigation ("FBI") and the Central Intelligence Agency ("CIA"). If a visa is not granted by midnight on the last day of the relevant fiscal year, the applicant's lottery ticket expires. 8 U.S.C. § 1154(a)(1)(G)(ii)(II); 8 C.F.R. §§ 42.33(a)(1), (d), (f).

## *The Underlying Mandamus Action*

Marianna Przhebelskaya ("Marianna") was selected as a DV Lottery winner in fiscal year 2003, spanning October 1, 2002 to September 30, 2003. On April 14, 2003, Marianna submitted an application to the Agency for the issuance of a diversity visa and an adjustment of status to that of lawful permanent resident. Vladimyr Przhebelskaya ("Vladimyr"), her husband, and Yevgenia Przhebelskaya ("Yevgenia"), her daughter, filed derivative applications on the same day. On April 24, 2003, the Agency denied Marianna's application and, on May 8, 2003, it denied her motion for reconsideration. As a result, the derivative applications of Vladimyr and Yevgenia were also denied.

After plaintiffs commenced an action for mandamus relief in this court on July 8, 2003, the Agency voluntarily reopened their cases. By September 24, 2003, however, six days before the end of the fiscal year, the Agency still had not adjudicated the applications because the FBI had failed to complete Marianna's background check. The applications were otherwise complete and Marianna's background check was the sole issue that prevented them from being granted. Following a conference, this court issued an Order on September 24, 2003 compelling defendants to "complete adjudication of plaintiffs' application for status adjustment immediately and, in any event, no later than September 30, 2003."

Following nearly six weeks of inaction, the FBI was able to complete Marianna's background

4

check within forty-eight hours. Marianna cleared the background check on the morning of Friday, September 26, 2003. On the same day, seemingly unaware of the Agency's representations to the court that the only open issue concerning plaintiffs' applications had been the FBI background check of Marianna, the Temporary Supervisory District Adjudications Officer (the "Supervisor"), who was the Agency official responsible for plaintiffs' applications, "examined plaintiffs' administrative files to determine whether they included all of the required elements for adjustment of status. During [his] initial examination on this day, [he] observed that Marianna's file did not include the required proof of a successfully completed background investigation by the [FBI]." Isoldi Decl. ¶ 5. The Supervisor did not obtain "sufficient proof" that the FBI background check was complete until "late in the day on Friday." Isoldi Decl. ¶¶ 5, 7. At that time, the Supervisor concluded that plaintiffs' applications should be granted, but did not complete the paperwork necessary to adjudicate and grant them. Rather, he set the applications aside to be dealt with on Monday morning. *Id.* On the morning of Monday, September 29, 2003, before the paperwork was completed, the Department of State issued a memorandum declaring, in relevant part, that "no DV-2003 numbers [are] available for allocation as a result of all 50,000 numbers provided to this category having already been made available. Therefore, any case which has not received DV-2003 visa authorization as of 10:00 am (edt) Monday, September 29 will not be processed." Isoldi Decl. Ex. A.

After receiving the memorandum, the Supervisor conducted a "nationwide search" for diversity visas that had been issued to applicants during fiscal 2003 but were returned to the Department of State.[4] He was able to "find" one such visa and used it to adjudicate and grant

---

[4] 22 C.F.R. § 42.51(c) provides: "An immigrant visa number shall be returned to the Department [of State] for reallocation within the fiscal year in which the visa was issued when: (1) An immigrant having an immigrant visa is excluded from the United States and deported; (2) An immigrant does not apply for admission to the United States

Marianna's application on September 30, 2004. Isoldi Decl. ¶ 10, Ex. B. He held the applications of Vladimyr and Yevgenia open until October 27, 2003, nearly a month past the statutory deadline. On that date, he concluded that "no other visa numbers under the 2003 Diversity Visa Program would become available," and denied the applications. Isoldi Decl. ¶ 12, Exs. C and D.

Plaintiffs made the instant motion on February 6, 2004, seeking that this court (1) hold defendants in contempt of its September 24, 2003 Order, and (2) compel defendants to adjust the status of Vladimyr and Yevgenia to that of lawful permanent residents.

## DISCUSSION

### I. Motion to Compel

The district courts have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff. 28 U.S.C. § 1361. When a district court orders the adjudication of an application for status adjustment based on the applicant's eligibility to receive a diversity visa, the Agency has an absolute duty to complete the adjudication and, if it finds that all of the application requirements are met, to issue the visa and grant the corresponding adjustment of status. Neither the expiration of the statutory deadline nor the fulfillment of the statutory quota extinguishes the Agency's obligation to comply with the court's order. Allowing the Agency to delay the adjudication and then claim inability to issue the visa "would impinge the authority of the court." *Iddir v. Immigration and*

---

before the expiration of the validity of the visa; (3) An alien having a preference immigrant visa is found not to be a preference immigrant; or (4) An immigrant visa is revoked pursuant to § 42.82 [for fraud or ineligibility]."

*Naturalization Service*, 301 F.3d 492, 501 n.2 (7th Cir. 2002).[5]

In *Paunescu v. Immigration and Naturalization Service*, 76 F. Supp. 2d 896 (N.D. Ill. 1999), one of the plaintiffs, Teodor Paunescu, was selected in the 1998 DV Lottery, and the other plaintiff, his wife, submitted a derivative application. Plaintiffs' applications were complete and timely, but the FBI failed to complete Mr. Paunescu's fingerprint check within the fiscal year, despite Mr. Paunescu having submitted fingerprints on three separate occasions. *Id.* at 898. Just prior to the end of the fiscal year, on September 25, 1998, the district court, exercising its mandamus jurisdiction, ordered the Agency "immediately [to] complete adjudication of the applications for adjustment [of] status" for both plaintiffs "without delay and by no later than September 30, 1998." *Id.* The Agency failed to comply with this order because the FBI did not complete the fingerprint check until October 8, 1998. Mr. Paunescu's fingerprints, in fact, cleared the screening process. *Id.* at 902. Characterizing the plaintiffs' experience as a "bureaucratic nightmare," the court held that the Agency's "failure to perform a non-discretionary duty within a reasonable time deprived plaintiffs of visas." *Id.* The court ordered the Agency to grant plaintiffs all relief "to which they would have been entitled had defendants processed their applications in a timely fashion." *Id.* at 903. In reaching its decision, the *Paunescu* court relied, in part, on *Marcetic v. Immigration and Naturalization Service*, 1998 WL 173129 (N.D. Ill. 1998). In that case, an immigration judge granted the plaintiff's application for status adjustment, based on his derivative eligibility for a diversity visa, during the fiscal year, but the Agency failed to issue the visa before the statutory

---

[5]Although defendants have argued only that the court's power is limited because the fiscal year has ended, and not because the number of diversity visas prescribed by the statute has been issued, the court notes that defendants could no more evade their obligation to comply with the court's order by asserting that no diversity visas are available than by asserting that the fiscal year had ended. *See Iddir*, 301 F.3d at 501 n2. Whether or not, as the court in *Iddir* found, the Agency was "on notice to reserve visas," defendants had a duty to "complete the task, as ordered." *Id.*

deadline. *Id.* at 1. The plaintiff brought an action for mandamus relief in the district court, and the court compelled the Agency to adjust plaintiff's status to that of lawful permanent resident. *Id.* at 1-2. "[S]omeone made a ministerial error," the court declared, "and it was not the plaintiff. Can plaintiff be denied a green card, separated from his family and ordered deported, in clear violation of the prior order, because of that administrative error? We think not." *Id.* at 1.

The Court of Appeals for the Seventh Circuit endorsed the outcomes of *Paunescu* and *Marcetic* in *Iddir v. Immigration and Naturalization Service, supra*. While holding that courts generally lack the power to compel the issuance of a diversity visa after the Agency's statutory authority to issue the visa has lapsed, the court distinguished the situation in which a prior court order, timely issued, had already directed the Agency to adjudicate a plaintiff's application. *Iddir*, 301 F.3d at 499-501. In such a case, the court has the power to vindicate its own order. Citing *Paunescu* and *Marcetic*, the court declared:

> It would be a different case had the district court ordered the INS to adjudicate the appellants' status *while* the INS maintained the statutory authority to issue the visas. In such a situation, the INS would be on notice to reserve visas and must complete the task, as ordered, before time expires. Allowing the INS to claim inability to issue visas at that point would impinge the authority of the court. *Id.*, 301 F.3d at 501 n.2 (emphasis in original) (citations omitted).

*See also Ahmed v. Dept. of Homeland Security*, 328 F.3d 383, 387 (7th Cir. 2003) ("Both the majority and the concurring opinion [in *Iddir*] recognized that the case would have been different if it had been filed before the end of the visa year, while the INS still had statutory authority to issue the visa, and if the district court had acted within that time period."). Similarly, in *Coraggioso v. Ashcroft*, 355 F.3d 730, 734 n.8 (3d Cir. 2004), the Court of Appeals for the Third Circuit held that it was powerless to act because the plaintiff did not bring suit until the fiscal year had ended, but stated that,

8

had plaintiff commenced the mandamus action prior to the end of fiscal 1998, he may have been entitled to relief.[6]

Here, plaintiffs sought the court's intervention, and the court granted relief, before the end of fiscal 2003, while diversity visas were still available. On September 24, 2003, the court ordered defendants to complete adjudication of plaintiffs' applications for status adjustment "immediately and, in any event, no later than September 30, 2003." The Order was a proper exercise of the court's mandamus jurisdiction because the Agency had a clear, "non-discretionary duty to issue a decision on plaintiffs' applications within a reasonable time," *Paunescu*, 76 F. Supp. 2d at 901; *accord Iddir*, 301 F.3d at 500 ("The relevant statutes and regulations confirm that the INS did have the duty to adjudicate the appellants' applications in a reasonable period of time."). *See generally, City of New York v. Heckler*, 742 F.2d 729, 739 (2d Cir. 1984) (holding that a writ of mandamus may issue only when "the defendant is under a clear nondiscretionary duty to perform the act requested.").

Defendants argue that the September 24, 2003 Order applied only to Marianna's application. Defendants' counsel, in fact, asserts that he "reasonably presumed that this case was only about Marianna's application." Defs.' Mem. at 11. But the first sentence of the court's Order plainly states: "For the reasons set forth at the conference held on September 24, 2003, plaintiffs' request

---

[6]Defendants point to cases which hold that a court, through an initial exercise of mandamus jurisdiction, may not compel the Agency to issue a diversity visa after the Agency's statutory authority to do so has lapsed. *See, e.g., Nyaga v. Ashcroft*, 323 F.3d 906, 913-16 (11th Cir. 2003); *Zapata v. Immigration and Naturalization Service*, 93 F.Supp. 2d 355, 358-60 (S.D.N.Y. 2000). These cases are not relevant here because they do not address the situation in which a court had ordered the Agency to act while the Agency still had the statutory authority to issue the visas. The existence of a prior order to compel is the dispositive factor in a case such as this one. *See Iddir*, 301 F.3d at 501 n.2; *Ahmed*, 328 F.3d at 387; *Coraggioso*, 355 F.3d at 734 n.8. *See also Nakamura v. Ashcroft*, 2004 WL 1646777, 2 (E.D.N.Y. 2004) ("In this case, Plaintiffs brought suit after the end of fiscal year 1998; thus *Paunescu* and *Marcetic* are inapplicable."); *Lavelle v. Dept. of Homeland Security*, 2004 WL 1975935, 5 (N.D. Cal. 2004) ("... [T]he court properly retained jurisdiction over Paunescu's action for the purpose of enforcing its own preliminary injunction, which the INS had disregarded. In contrast, Lavelle failed to file her complaint in this action until February 2004, long after fiscal year 2003 had ended.") (citations omitted).

9

for relief is granted." Plaintiffs distinctly requested that the applications of all three plaintiffs be adjudicated, and the applications were addressed collectively, both in the parties' submissions and at the conference held on September 24, 2003. It is true, as defendants point out, that the conference focused on the FBI background check of Marianna, but that is because defendants represented to the court that Marianna's background check was the sole issue delaying all three applications and that, once the background check was complete, all three applications could be granted. In sum, the underlying proceedings as a whole, and the court's September 24, 2003 Order specifically, addressed the applications of all three plaintiffs without ambiguity.

It is undisputed that Vladimyr and Yevgenia submitted complete and timely applications for diversity visas in fiscal year 2003 and that, but for the Agency's delay in processing those applications, the visas would have been issued and their status adjusted. In a declaration made pursuant to 28 U.S.C. § 1746, the Supervisor states: "Given that Plaintiffs' cases were not ready for final adjudication until late in the day on Friday, September 26, 2003 . . . I placed Plaintiffs' files with other diversity visa cases that were ready to be assigned to a [subordinate] and adjudicated on Monday, September 29, 2003." Isoldi Decl. ¶ 7. The cases actually were ready for adjudication on Friday morning, as soon as the FBI background check of Marianna was complete, but the Supervisor's apparent lack of familiarity with the case and lack of knowledge of the FBI's action caused a delay. (It is unclear from the record what caused this lack of knowledge. The Assistant United States Attorney ("AUSA") reports that he was informed, on the *morning* of Friday, September 26, 2003, "by the [Agency's] liaison to the FBI that Marianna's background investigation had been completed successfully . . . ." Decl. of AUSA Steven Kim ¶ 7.) After the Supervisor learned that the FBI check had been completed, his decision to postpone adjudication of the

applications until Monday caused a further delay. Under the circumstances, those delays were not reasonable. Defendants knew that time was of the essence because only a limited number of diversity visas were available.[7]

Had the Agency performed the ministerial acts necessary to complete adjudication of plaintiffs' applications *immediately* upon completion of Marianna's FBI background check, in accordance with the court's order, the applications of Vladimyr and Yevgenia would have been granted. Because of the inexcusable bureaucratic delay, those applications were denied. Thus, here, as in *Paunescu*, the Agency's "failure to perform a non-discretionary duty within a reasonable time deprived plaintiffs of visas." *Paunescu*, 76 F. Supp. 2d at 902.

Accordingly, the court now orders defendants to grant plaintiffs the relief to which they would have been entitled had defendants complied with the court's prior Order, or timely adjudicated plaintiffs' applications for status adjustment in the first instance. Specifically, the court orders defendants to adjust the status of Vladimyr and Yevgenia to that of lawful permanent residents, pursuant to Section 245(a) of the INA.

## II. Motion for Contempt

Because the relief sought by plaintiffs' motion for contempt is the same as that sought by

---

[7] The court acknowledges the Supervisor's declaration that he "had no knowledge or reason to believe that all 50,000 diversity visa numbers would be used before September 30, 2003," Isoldi Decl. ¶ 9, and defendants' representations that, in recent years, the Department of State and the Agency have failed to issue all of the diversity visas made available by statute. Nevertheless, defendants should have been aware of the possibility that all 50,000 diversity visas might be issued before the end of the fiscal year. At the proceedings held on September 24, 2003, counsel for the Agency told the court that the number of diversity visas issued "is close [to 50,000] every year" and that "[t]hey do on occasion run out of visas through this program." Tr. at 6. Furthermore, the AUSA said that the Department of State and the Agency "make efforts . . . to use all the visas and that's why they notify twice as many people . . . ." Tr. at 8.

11

their motion to compel, the court declines to reach the issue of whether the Agency's noncompliance with the September 24, 2003 Order rises to the level of contempt. Plaintiffs may, however, renew their motion for contempt should defendants fail to comply with this Order.

## CONCLUSION

For the foregoing reasons, plaintiffs' motion to compel is granted, and defendants are ordered to adjust the status of Vladimyr Przhebelskaya and Yevgenia Przhebelskaya to that of lawful permanent residents without further delay. The Clerk of Court is directed to close this case.

**SO ORDERED.**

_____
**NINA GERSHON**
**United States District Judge**

Dated:   Brooklyn, New York
         September 30, 2004